[L. A. No. 18634. In Bank. Mar. 23, 1945.]

THE IRVINE COMPANY (a Corporation), Respondent, v. CHARLES J. McCOLGAN, as Franchise Tax Commissioner, etc., Appellant.

Robert W. Kenny, Attorney General, and H. H. Linney and James E. Sabine, Deputies Attorney General, for Appellant.

Scarborough & Petty and Jas. G. Scarborough for Respondent.

GIBSON, C. J.—This is an appeal from a judgment for the plaintiff in two consolidated actions brought to recover a portion of the franchise tax paid to the State of California by plaintiff on its statutory net income for its fiscal year ending April 30, 1935.

Plaintiff is a corporation organized under the laws of West Virginia, and authorized to transact business in California. Its only office and place of business is in Orange County, California, where it owns a large tract of land and is engaged in the business of raising, harvesting, preparing for market and selling horticultural and agricultural products. During 1935, some of plaintiff's products were marketed in California, but the greater portion thereof was marketed outside of the state in the following manner:

(1) Citrus fruits, avocados and walnuts were sold by plaintiff under marketing agreements with various local nonprofit cooperative marketing associations of which plaintiff was a member or stockholder. Pursuant to those agreements, plaintiff delivered the fruit to local associations which cleaned, graded, packed and shipped the same to marketing centers or points outside the state. Citrus fruit was shipped from the associations' packing houses in California to other states or foreign countries where it was sold from railroad or steamship terminals through the facilities of the California Fruit Growers Exchange, a cooperative with which the local associations were affiliated and which acted as the latters' sales agency. The fruit was shipped under negotiable bills of lading, consigned to the exchange or to independent produce brokers who were engaged by the exchange to sell fruit on a commission basis. Sales at public auction and private sales were conducted by such brokers or by employees of the exchange.

Subject to a minimum asking price specified by the shipper and the right of withdrawal reserved by the exchange, the prices and quantities of fruit sold were determined at the time and place of sale by the brokers or employees without prior confirmation from plaintiff or the associations. Proceeds from such sales were collected by the brokers or employees, who, after deducting freight, storage, sales, insurance, taxes and other expenses, including brokerage fees or commissions, transmitted the balance to the exchange. Thereafter in the ordinary course of business plaintiff received from the local associations its pro rata share of the proceeds less its pro rata share of expenses. Walnuts were handled in a somewhat similar manner, being consigned to the California Walnut Growers Association, stored in warehouses in its name, and later withdrawn and sold exclusively at private sales by independent brokers engaged by it on a commission basis. Avocados were marketed in a slightly different manner in that after arrival at their destination they were stored in warehouses in the name of the local association and thereafter withdrawn and sold by it at private sales.

(2) The bulk of plaintiff's bean crop was prepared for market and shipped by plaintiff to out-of-state destinations where it was stored in warehouses or at railroad and steamship terminals and thereafter sold by brokers on a commission basis. Such produce was consigned to plaintiff on negotiable bills of lading or to independent produce brokers. Subject to a minimum asking price specified from time to time by the shipper, sales were made at prices and in quantities determined by the brokers without prior confirmation from plaintiff. The brokers collected the proceeds and, after deducting freight, storage, sales, insurance, taxes and other expenses, including their commissions, transmitted the balance to plaintiff in California.

(3) A portion of plaintiff's bean crop and other vegetables were prepared for market and shipped by plaintiff to points outside California consigned to purchasers on bills of lading with sight drafts attached. Proceeds from such sales were forwarded to plaintiff by collecting banks.

In July, 1935, plaintiff filed a franchise tax return and paid to the state a tax measured by its total statutory net income for the year. In 1937, it filed a claim for refund on the ground that it had done business outside as well as within California

during 1935 and, accordingly, its tax should have been measured only by that portion of net income reasonably attributable to business done within the state. Plaintiff's claim was rejected, whereupon the present action was commenced. The parties having stipulated to the facts heretofore recited, the trial court held that under the taxing statute plaintiff was entitled to "allocation of some portion of its statutory net income . . ., thereby entitling plaintiff to refund of some portion of the franchise tax." The question of the extent of allocation and other issues relating thereto were then submitted to the court on a supplemental stipulation of facts. On the basis of a three-factor formula consisting of property, expenses and sales, it determined that only 56.08 per cent of plaintiff's net income, representing the proceeds from the sale of its products both within and without the state, was derived from or attributable to business done within the state. Judgment was entered for plaintiff in the sum of $7,884.93, the difference between the amount paid and the amount found due.

The California Bank and Corporation Franchise Tax Act (Stats. 1929, p. 19; Deering's Gen. Laws, 1937, Act 8488), imposes upon corporations doing business in this state a tax, measured by net income, for the privilege of exercising their corporate franchises within the state. The term "doing business" is defined therein as "actively engaging in any transaction for the purpose of financial or pecuniary gain or profit." (§ 5.) Section 10 provides that "If the entire business of the . . . corporation is done within this State, the tax shall be according to or measured by its entire net income; and if the entire business of such . . . corporation is not done within this State, the tax shall be according to or measured by that portion thereof which is derived from business done within this State."

The primary question on this appeal by defendant is whether within the meaning of section 10 of the act plaintiff was doing business outside of California as well as in California so as to be entitled to have its franchise tax measured by only a portion of its net income. Defendant contends that since plaintiff had no place of business, property, or regular employees outside this state, raised its produce and prepared the same for market entirely within this state, and here received the proceeds from extrastate and interstate sales, it carried on its corporate activities and was "doing business"

only in California. He argues that sales in other states were made by purchasers of plaintiff's produce or by independent contractors, and that interstate sales transactions are to be regarded as business done in this state. On the other hand, plaintiff contends that its products were marketed outside the state in such a manner as to constitute the transaction of business by it outside of California. It argues that extrastate sales transactions or activities were carried on by plaintiff through its authorized agents, that the consummation of interstate sales entitled it to allocation, and that a tax on its entire net income would be void under the commerce and due process clauses of the United States Constitution to the extent that proceeds from interstate sales entered into the measure thereof.

As previously noted, three types of transactions figured in the marketing of plaintiff's products outside of California—viz., sales through the medium of cooperative marketing associations, sales by independent produce brokers, and sales in the channels of interstate commerce. ■ With respect to transactions of the first type by which plaintiff disposed of its fruit crops, the parties are in conflict as to whether marketing agreements between plaintiff and the cooperative association created the relationship of seller and buyer or principal and agent. It is generally recognized that there are two kinds of cooperative marketing agreements, sales and agency, and that the determination of whether a particular agreement is to be classified as one or the other depends upon the intention of the parties thereto. (*United States* v. *Rock Royal Co-op.*, 307 U.S. 533 [59 S.Ct. 993, 83 L.Ed. 1446]; *Yakima Fruit Growers' Assn.* v. *Hall*, 180 Wash. 365 [40 P. 2d 123]; *Spencer Co-op. Live Stock Shipping Assn.* v. *Schultz*, 209 Wis. 344 [245 N.W. 99]; 98 A.L.R. 1413; Treadwell, *The Law of Co-operative Marketing*, 15 Cal.L.Rev. 85.) In California, however, cooperative marketing agreements have been classified or construed as contracts of agency even when, as in this case, they contained language of sale. (*Poultry Producers* v. *Barlow*, 189 Cal. 278 [208 P. 93]; *Poultry Producers* v. *Murphy*, 64 Cal.App. 450 [221 P. 962].) But whether such agreements are to be so classified in all cases, and whether the agreements in the present case should be construed as contracts of agency or sale, need not be determined, for even if it be assumed that an agency relation ex-

isted, it does not follow that plaintiff was "doing business" outside of California within the meaning of section 10 by reason of the cooperative associations' activities in other states.

Transactions engaged in *for* a foreign corporation in a state are not necessarily engaged in *by* the corporation in that state. As stated in *Union Internationale De Placements* v. *Hoey,* 96 F.2d 591, 592, "business transactions within the taxing jurisdiction for the account of a foreign corporation do not necessarily involve the doing of business within the jurisdiction." Thus, although factors or commission merchants are agents, it has been held that their activities in a state do not constitute the doing of business therein by the foreign principals they represent within the purview of statutes imposing franchise or license taxes. (*People* v. *Roberts,* 48 N.Y.S. 1028; *City of Atlanta* v. *York Mfg. Co.,* 155 Ga. 33 [116 S.E. 195]; *cf. People* v. *Gilchrist,* 244 N.Y. 114 [155 N.E. 68]; 61 C.J. 339.) Support for this position is found in the analogy afforded by decisions to the effect that foreign corporations are not doing business so as to be subject to the qualification laws of, or amenable to process in, states to which their products have been consigned for sale and sold by factors or commission merchants. (*Bartling Tire Co.* v. *Coxe,* 288 F. 314; *Mitchell Wagon Co.* v. *Poole,* 235 F. 817 [149 C.C.A. 129]; *Butler Bros. Shoe Co.* v. *United States Rubber Co.,* 156 F. 1 [84 C.C.A. 167]; *Republic Steel Corp.* v. *Atlas Housewrecking & L. Corp.,* 232 Mo.App. 791 [113 S.W.2d 155]; 17 Fletcher, Cyclopedia Corporations, 520; see *Cannon Mfg. Co.* v. *Cudahy Pkg. Co.,* 267 U.S. 333, 336 [45 S.Ct. 250, 69 L.Ed. 634]; *cf. Bank of America* v. *Whitney Central Nat. Bank,* 261 U.S. 171 [43 S.Ct. 311, 67 L.Ed. 594].) The decisions reason that since factors or commission merchants are independent contractors, the disposition of goods in their possession in accordance with the directions of their foreign principals constitutes a part of their business rather than the business of the individuals or corporations whose products they sell. (*People* v. *Roberts, supra,* at p. 1029; 23 Am.Jur. 308.) In other words, jurisdiction of foreign corporations for purposes of process and regulation, as well as taxation, is dependent upon their presence or the exercise of their corporate franchises, and the sale of products of such corporations by independent contractors does not involve cor-

porate presence or the exercise of corporate franchises. (*Cf.* *Union Internationale De Placements* v. *Hoey, supra.*)

It would seem to follow that if a foreign corporation marketing its products in a state through factors is not thereby "doing business" in that state, it is not thereby "doing business" outside of the state in which it engages in production activities. (*Cf.* Watson, *Allocation of Business Income for State Income Tax Purposes,* 25 Minn.L.Rev. 851, 894, n. 179.)

We are of the opinion that cooperative marketing associations are factors, or so closely akin thereto that the question whether plaintiff was doing business outside of California by reason of their sales transactions or activities in other states is governed by the foregoing authorities. Section 2026 of the Civil Code defines a factor as an "agent who, in the pursuit of an independent calling, is employed by another to sell property for him, and is vested by the latter with the possession or control of the property, or authorized to receive payment therefor from the purchaser." Clearly cooperatives which market the produce of their grower members in the manner disclosed by the facts of this case are embraced in that definition, and it has been so held in this state. (*Betts* v. *Southern Cal. etc. Exchange,* 144 Cal. 402 [77 P. 993] ; *Cooper* v. *American Fruit Growers Inc.,* 137 Cal.App. 494 [30 P.2d 558].) Plaintiff argues, however, that the members of a nonprofit cooperative association in legal effect constitute the association, that the acts of the latter are the acts of the former, and that therefore the cooperatives in this case did not act as factors or independent contractors in selling plaintiff's produce. The argument is in reality a plea to disregard the corporate entity of the cooperatives for tax purposes. Similar pleas in comparable situations have been rejected, as where, for example, a foreign corporation employed a wholly owned and dominated subsidiary as an instrumentality to market its products in the taxing jurisdiction. (*People* v. *Gilchrist,* 244 N.Y. 114 [155 N.E. 68] ; *Cannon Mfg. Co.* v. *Cudahy Pkg. Co.,* 267 U.S. 333 [45 S.Ct. 250, 69 L.Ed. 634] ; *Procter & Gamble Co.* v. *Newton,* 289 F. 1013.) And the corporate entity of cooperative marketing associations has been strictly observed in a variety of situations, including the application in California of the franchise tax act under discussion. (*California Pear Growers Assn.* v. *Johnson,* 219 Cal. 98 [25 P.2d 414].) There has been no showing in the

present case of such interference by plaintiff in the conduct of the associations' business as would justify either the conclusion that the associations were mere bookkeeping devices or that they did not enjoy the status of independent contractors. On the contrary, it appears that plaintiff's activity in the marketing of its produce ceased when it delivered the same to the local cooperatives in California, and that plaintiff did not determine the manner, place, or time of sale, nor the prices and quantities of produce sold.

We conclude that a corporation transacting business in this state is entitled to an allocation of income for franchise tax purposes only when business is done outside of the state *by* the corporation acting through its officers or agents, that a cooperative marketing association is not such an agent of its grower members that the latter can be said to be doing business where sales by the former take place, and that, therefore, plaintiff was not entitled to allocation merely because its products were sold in other states by cooperative marketing associations. In addition, it might be noted that with the exception of avocado sales, the activities of the local cooperatives were confined to California; that the vast majority of sales were arranged and conducted by the California Fruit Growers Exchange and the California Walnut Growers Association under marketing agreements with the local cooperatives; and that at least some of the extrastate sales were made by independent produce brokers employed by the exchange and the association.

With respect to the marketing of plaintiff's bean crop by independent produce brokers, the parties are again in disagreement as to the effect of extrastate sales. While plaintiff insists that the making of such sales constituted the doing of business by it outside of this state, defendant urges a contrary conclusion on the ground that the brokers were independent contractors.

It should be noted at the outset that some of those sales followed the consignment of produce to brokers, whereas others followed consignments to plaintiff itself. Properly speaking, the brokers to whom produce was consigned for sale were factors (Cal. Civ. Code, § 2026; 22 Am.Jur. 307), and their activities are governed by the rules heretofore discussed. The brokers selling produce consigned to plaintiff were authorized to receive payment therefor from the purchasers and hence

possibly were also factors. In any event, they were independent contractors (1 Rest., Agency, § 1, Comment d, § 2 Comment b), and the brokerage sales differed from the factorage sales only in that the produce involved in the former was consigned to plaintiff and stored in its name in warehouses in the selling states. But the presence outside the state of property alone has not been considered the doing of business outside the state, and the maintenance of stock by a foreign corporation in the selling state does not make the selling thereof the business of the corporation rather than that of the broker. (*Cf. United States Glue Co.* v. *Town of Oak Creek,* 161 Wis. 211 [153 N.W. 241, Ann.Cas. 1918A 421] ; *Trane Co.* v. *Tax Commission,* 235 Wis. 516 [292 N.W. 897].)

We are of the opinion, therefore, that a corporation transacting business in this state is not doing business outside of the state within the meaning of section 10 of the Bank and Corporation Franchise Tax Act, by virtue of the fact that its products are sold from warehouses in other states by independent brokers. (See Watson, *Allocation of Business Income For State Income Tax Purposes,* 25 Minn.L.Rev. 851, 877, 893.) And we think it is worthy of note that since at least 1934, section 10 has been construed in conformity with this view by the administrative officials charged with its enforcement, and that it has been twice reenacted or amended since 1934. (Appeal of Great Western Electro Chemical Co., Cal.C.C.H. Tax Service, par. 5-802.3.)

It would seem clear that if plaintiff was not doing business outside of this state by reason of the fact that its products were sold by independent brokers from warehouses in other states, it was not doing business outside the state when it shipped a portion of its bean crop and other vegetables directly to purchasers in other states upon orders obtained or sales made therein by independent produce brokers. ■ The argument that plaintiff is entitled to an allocation because the latter sales partook of the nature of transactions in interstate commerce, is successfully countered by the argument that plaintiff's entire business was done within this state since all of its activities giving rise to income from interstate sales were carried on in California.

■ Finally, we are of the opinion that plaintiff's contention that a tax on its entire net income would be violative of the commerce and due process clauses of the federal Consti-

tution is fully answered in cases such as *Matson Navigation Co. v. State Board of Equalization,* 297 U.S. 441 [56 S.Ct. 553, 80 L.Ed. 791]; *Western Cartridge Co. v. Emmerson,* 281 U.S. 511 [50 S.Ct. 383, 74 L.Ed. 1004]; *Hump Hairpin Mfg. Co. v. Emmerson,* 258 U.S. 290 [42 S.Ct. 305, 66 L.Ed. 622]; and *American Mfg. Co. v. St. Louis,* 250 U.S. 459 [39 S.Ct. 522, 63 L.Ed. 1084].

The judgment is reversed.

Edmonds, J., and Traynor, J., concurred.

CARTER, J.—I concur in the judgment of reversal, and agree generally with the views expressed in the opinion prepared by the Chief Justice, but I do not believe it is material whether the cooperative marketing association was the agent of plaintiff or was an independent contractor. Assuming the agency relationship existed between plaintiff and the cooperative, the facts remain that plaintiff's income was derived from products produced in California and sold by an agent operating in California. The agent-cooperative dealt with brokers and factors outside the state. It did not do any business in other states. The sales in various places did not constitute doing business in those places by the agent or by plaintiff within the meaning of the taxing statute. In those instances in which the cooperative had agents in other states, as distinguished from independent brokers, who were engaged in selling the products delivered to the cooperative, it is vital to note that these agents had no places of business in the other states and were in no different category from soliciting or selling agents operating outside of California. The activity of such agents, assuming they were also the agents of plaintiff, did not constitute doing business in those states within the meaning of the tax statute. In *Montag Bros. v. State Revenue Commission of Georgia,* 50 Ga.App. 660 [179 S.E. 563], a statute and situation similar to that involved in the instant case was considered, and in holding the income taxable, the Supreme Court of Georgia stated at page 566 [179 S.E.]:

"The tax being thus imposed upon the 'net income from property owned' in the state as well as 'from business done' in the state, where, as under the stipulated facts of this case, a domesticated corporation maintained its only office and place

of business in this state, owned and manufactured all its goods therein, and received therein all the proceeds from its sales made within and without the state, all from its state-owned plants and products manufactured in this state, and all from its state-owned property and state-managed business and office, from which it merely sent out samples *and operated a subordinate sale office with office equipment and salesmen out of the state under the control of its state office* and an executive living within the state, its *entire net income from these sales would be subject to the tax,* whether it be deemed a resident corporation, or a non-resident corporation with the right of invoking the inhibitions of the Fourteenth Amendment to the Federal Constitution, since neither the imposition by the statute nor the collection of such a tax would contravene that amendment. The fact that part of the sales were made in interstate commerce, or that the title to some of the goods may have passed to purchasers outside the state, or even that some of the sale contracts might be taken as made outside the state (construing in favor of the taxpayer the ambiguous stipulation in regard to the time and place of 'confirmation' and the closing of sales), would not relieve the seller from tax upon the net earnings from such sales, where the manufacturing plant was located, the products were manufactured and owned, the shipments and payments were made, and every important step connected with the manufacture, distribution, sales, collection and earnings occurred, in Georgia.'' (Italics added.) (182 Ga. 568 [186 S.E. 558]. See, also, *Commonwealth* v. *Bayuk Cigars,* 345 Pa. 348 [28 A.2d 134]; affd. 318 U.S. 746 [63 S.Ct. 991, 87 L.Ed. 1123].)

It seems clear to me that the income derived from the out of state sales in the instant case constituted income from business transacted in this state within the purview of the tax statute, and was therefore properly taken into consideration in computing the franchise tax payable by plaintiff.

SHENK, J.—I dissent. In order to arrive at their conclusion the majority have by-passed the authorities which distinctly hold that the cooperative is the agent of its members, notably such cases as *California Bean Growers Assn.* v. *Rindge L. & N. Co.,* 199 Cal. 168, 181 [248 P. 658, 47 A.L.R. 904]; *Poultry Producers* v. *Barlow,* 189 Cal. 278, 279, 281 [208 P. 93]; *Haarparinne* v. *Butter Hill Fruit Growers*

*Assn.*, 122 Me. 138 [119 A. 116]; *Johnson* v. *Staple Cotton Cooperative Assn.*, 142 Miss. 312, 331 [107 So. 2]; *Brown* v. *Staple Cotton Cooperative Assn.*, 132 Miss. 859, 889 [96 So. 849]; *Cole-McIntyre-Norfleet Co.* v. *DuBard*, 135 Miss. 20, 32 [99 So. 474]; *Spencer Co-op. Live Stock Shipping Assn.* v. *Schultz*, 209 Wis. 344, 346 [245 N.W. 99]; *Mountain States Beet Growers Marketing Assn.* v. *Monroe*, 84 Colo. 300, 311 [269 P. 886]; *Industrial Commission* v. *United Fruit Growers Assn.*, 106 Colo. 223 [103 P.2d 15]; *Texas Certified Cottonseed Breeders' Assn.* v. *Aldridge*, 122 Tex. 464 [61 S.W. 2d 79, 82]; *Kansas Wheat Growers Assn.* v. *Board of Com'rs of Sedgwick County*, 119 Kan. 877 [241 P. 466]; *Oregon Growers Cooperative Assn.* v. *Lentz*, 107 Ore. 561 [212 P. 811]. They have been at great pains to draw an analogy between a cooperative and an independent broker. Identity of the two does not exist either in economic function or in legal contemplation.

The broker is an independent contractor, who deals with all who consign products, and who after sale returns the proceeds to the consignor, making deduction for expenses and a profit for himself. The cooperative has no independence. Its services may be and are performed by its members, and for its members only. Its function is to receive, process, distribute and sell the products of its member growers, returning to its members the proceeds less expenses only. Since members are obligated to deliver their entire crop to the cooperative and operate on a mutual help basis exclusively for themselves it is immaterial whether the reciprocal obligation is written in terms of sale or agency. The same result obtains as to a cooperative distributing agency having a membership exclusively of cooperative producer organizations. They are likewise mutually dependent and exist only for their cooperative members, who in turn exist only for their member producers. Both are strictly nonprofit. Both belong to the producer who has a voice in and directs the affairs of the cooperative marketing association and through it the cooperative distributing agency. The fallacy in the majority's conclusion that the plaintiff's activity ceases when it delivers produce to the cooperative marketing association lies in the statement that the plaintiff does not determine the manner, place, or time of sale, nor the prices and quantities of produce sold. On the contrary, as a member of the cooperative mar-

keting association, the plaintiff has a voice in the cooperative management through a properly constituted board elected by the members.

The state has recognized the economic desirability of cooperative marketing associations by setting up the machinery for their organization and operation. The majority have not demonstrated why the members of such associations are not entitled to the full benefits flowing from the legislative recognition. The problem is not solved by talk of tax evasion or creating opportunity for tax evasion. The problem, if there is one, is for the Legislature and not for the courts. The courts would be quick to detect evasion by the discovery of a mere legal cloak of cooperation which does not in fact exist. Since the Legislature and the courts have recognized the cooperating members as the cooperative organization when they are organized in accordance with law for cooperative purposes, it is not for the court to say that they shall be recognized as such for one purpose but not for another.

The trial court found on sufficient evidence that the plaintiff was, in part, doing business in the State of New York, and the formula of allocation under the statute has not been successfully questioned by the defendant. In my opinion the judgment should be affirmed.

Schauer, J., concurred.

Respondent's petition for a rehearing was denied April 19, 1945. Shenk, J., and Schauer, J., voted for a rehearing.